UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
:
WILLIAM E. SLUE, JR.,                            :
:
                          Plaintiff,             :
:
        -v-                                      :
:
NEW YORK UNIVERSITY MEDICAL CENTER, :
NEW YORK UNIVERSITY SCHOOL OF          :
MEDICINE, NEW YORK UNIVERSITY, IRWIN :          04 Civ. 2087 (GEL)
M. FREEDBERG, M.D., ANITA P. ORLIN,     :
REGINALD ODOM, JOHN E. HARNEY,          :          **OPINION AND ORDER**
DECISION STRATEGIES, LLC., JEFF KERN,  :
IRIS CORTEZ, the name is fictitious since the true :
name of this individual is presently unknown to   :
Plaintiff, "JOHN DOE", and "JANE ROE", the      :
complete names of whom are fictitious since the   :
true names of these individuals are presently      :
unknown to Plaintiff,                            :
:
                          Defendants.            :
:
-------------------------------------------------------------x

Donald L. Citak, Citak & Citak,
New York, New York, <u>for plaintiff</u>.

Joel E. Cohen, McDermott Will & Emery LLP,
New York, New York, <u>for defendants</u>.


GERARD E. LYNCH, District Judge:

        Plaintiff William E. Slue, Jr. ("Slue") brings this diversity action against his former

employers, New York University Health Center ("NYU Health Center")[1] and New York

University School of Medicine ("NYU Medical School"); various former supervisors and NYU

---

[1] The parties and the documentary evidence use the terms "NYU Health Center" and
"NYU Medical Center" interchangeably.

personnel; Decision Strategies, Inc. ("Decision Strategies"), a private investigation firm; and an individual investigator. In a ten-count complaint, plaintiff charges various state causes of action, alleging wrongful discharge and breach of contract, improper termination of lease, improper denial/termination of benefits, conversion, defamation, intentional infliction of emotional distress, interference with contract, intentional interference with economic opportunity, and violation of federal and state privacy laws. Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56(c) on all claims. Plaintiff cross-moves for summary judgment on NYU defendants' first counterclaim, breach of fiduciary duty. Defendants also move to strike plaintiff's cross-motion for summary judgment as untimely and move to strike various allegations from his complaint. The defendants' motion for summary judgment is granted in part and denied in part. The plaintiff's motion for summary judgment will be granted. The defendants' motion to strike will be denied.

## BACKGROUND

Slue began working as a pharmacy aide at NYU Health Center on June 11, 1962. (Slue Dep. 7.) In 1976, he began to work for NYU Health Center as a medical photographer in the Dermatology Department, and he was promoted to Supervisor of Medical Photography in 1987. (Slue Aff. ¶ 2.)

Slue was appointed to NYU Medical School as a part-time, non-tenured teaching assistant in 1995. This appointment was renewed annually; Slue has provided documentation of his appointment renewal through the 2001-2002 academic year.[2] (Citak Aff. Ex. Q; see also

---

[2] Plaintiff alleges that his faculty appointment was renewed through the 2003-2004 academic year, but while he provides documentation confirming his renewal from 1998-1999 to 2001-2002, he does not provide documentation for the last two academic years. (Compl. ¶ 28;

Levin Dep. 32-33, 39-40.) During this period, Slue gave at least two lectures in the Department of Dermatology and taught residents how to put their lectures together. (Slue Dep. 32-33.) Slue did not receive an increase in compensation with his appointment as a faculty member. (Slue Dep. 30.)

Since 1988, plaintiff has also owned and operated William Slue Services, Inc., a private dermatology photographic business through which he sees private patients. Through his private practice, Slue developed the Total Body Photography ("TBP") technique, a specialized form of dermatology photography designed to detect early forms of melanoma. (See Cohen Aff. Ex. 18 at 1239.) When it was first developed, the TBP session consisted of the photographer taking a series of twenty-three images of an individual's skin surfaces using 35-mm film, while the patient was completely nude, taken in a matter of minutes so as to minimize the individual's discomfort level. (Id.; Slue Aff. ¶ 7.) After a TBP session, prints would be made from the slides and placed in a book. (Id. at ¶ 8.) Later, Slue began to take a total of twenty-six images in a standard TBP session, taking additional images if necessary. (Id. at ¶ 6.) In early 2002, plaintiff switched to digital equipment, which was less costly and less time-consuming, but continued to use 35-mm film as a backup and to ensure the quality of the photographs. (Id. at ¶ 9.)

Starting in 1988, Slue operated his private practice at a location outside NYU Health Center. In October 2002, Slue entered into an agreement with NYU Health Center to use office space at the Health Center in Room H124 to conduct his private practice, in exchange for a payment of $400 per month. (Orlin Dep. 126-27; Freedberg Dep. 150; Harney Dep. 21-22.) Under this agreement, Slue was authorized to use the space several times per month on evenings

---

Citak Aff. Ex. Q.)

and weekends to see private patients for TBP sessions.  (Harney Dep. 21-22.)  Other than the $400 rent, Slue did not pay NYU Health Center any portion of the income generated from the use of this space.  Slue never signed any document memorializing this agreement.  (Slue Aff. ¶ 17; Orlin Dep. 126.)  Slue's TBP sessions were all conducted as part of his private practice and were not undertaken as an NYU Medical School faculty member or NYU Health Center employee.  (Slue Aff. ¶ 23.)

After receiving complaints from Anne Stoecker, Slue's photography assistant, regarding Slue's excessive use of time and NYU space for his private practice, Sheila Furjanic, Director of Compliance at NYU Health Center, initiated an investigation.  (Furjanic Dep. 27-29; Stoecker Dep. 52-53.)  Months later, after a discussion with Slue's previous photography assistant, Stoecker complained to Frujanic regarding her observations of Slue's practice of taking additional slides of female patients and making sexually inappropriate comments about patients and employees.  (Stoecker Dep. 87-88.)  Following these complaints, the Health Center retained the services of Decision Strategies, an investigation firm, to conduct an independent investigation of Slue.  (Kern Dep. 13-14.)  As part of the investigation, Decision Strategies sent an undercover female agent, Iris Cortez,[3] to pose as Slue's patient at a TBP session.  Defendants do not dispute that Stoecker went into Slue's briefcase, without permission, and took several slides taken of Iris Cortez.  (See Slue Aff. ¶ 27.)

On January 26, 2004, the results of this investigation were discussed at a meeting among Reginald Odom, Senior Director of Human Resources at the Health Center; John E. Harney, Senior Vice President of the Health Center; Dr. Irwin M. Freedberg, Chair of the Dermatology

_____

[3] Iris Cortez was the alias used in connection with the investigation.  (D. Mem. 1 n.2.)

Department and a tenured professor at NYU Medical School; and Anita Orlin, Administrator of the Department of Dermatology and Slue's supervisor. (Harney Dep. 34.) At this meeting, the parties concluded that the photographs of Cortez were inappropriate, and called Slue into the meeting to explain how and why the photos of Cortez were taken. (Odom Dep. 41-42; Harney Dep. 33-38; Slue Aff. ¶ 28.) Finding his explanation inadequate, defendants suspended Slue from his employment pending further investigation on January 27, 2004. (Odom Dep. 93.) After Slue was suspended, several of the defendants met to examine the photographic slides that plaintiff had taken of patients. The slides were not kept in Slue's office, but in Dr. Alfred Kopf's office at NYU Health Center. (D. Rule 56.1 Statement ¶ 83.) The defendants found that certain slides of several female patients were missing, but no slides from any male patients were missing. (Id. at ¶¶ 88-89.)

Slue vigorously denies that he engaged in any inappropriate conduct as a photographer. (Slue Aff. ¶¶ 9-14, 21.) He offers an affidavit from another medical photographer, who states that taking photos with 35 mm film as a backup to digital photos is reasonable TBP practice. (See Witmer Aff. ¶¶ 7-9. ) Plaintiff also offers an affidavit from an individual who chaperoned his photographic sessions with patients for over 15 years, who states that she heard no complaints and never observed any inappropriate or sexual conduct towards any patient. (See Richards Aff. ¶¶ 3-7.)

At defendants' request, plaintiff appeared for a meeting with defendants on January 30, 2004. However, plaintiff refused to meet without his attorney present, defendants would not meet with the attorney, and plaintiff was fired. (D. Rule 56.1 Statement ¶¶ 98-102.)

# DISCUSSION

## I.    Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Id., 477 U.S. at 256. A genuine issue of material fact is established "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion." Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). In addition, the court is not to make any credibility assessments or weigh the evidence at this stage. Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

The party opposing summary judgment, however, may not rely on "conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Likewise, a mere scintilla of evidence will not suffice. Anderson, 477 U.S. at 252. The nonmoving party, instead, must "set forth specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.11 (1986), quoting Fed. R. Civ. P. 56(e). Emulating the standard for a directed verdict under Rule 50(a), summary judgment is proper when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

II.    <u>Employment and Benefits Claims</u>

    A.  <u>Wrongful Discharge and Breach of Contract</u>

In Count One, Slue alleges that he was improperly terminated from his positions as an employee of NYU Health Center and of NYU Medical School, asserting claims of wrongful discharge and breach of contract.  (Compl. ¶¶ 60-62.)  Slue claims that his suspension and termination at NYU Health Center violated the rules and regulations set forth in the NYU Health Center's Policies and Procedures Manual ("Manual") and Staff Handbook ("Staff Handbook").  He also claims that his discharge as a Teaching Assistant at the Medical School violated the rules and regulations set forth in its Faculty Handbook ("Faculty Handbook").  (<u>Id</u>. at ¶¶ 60-61.)  These claims must be dismissed.

It is "settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party."  <u>Sabetay v. Sterling Drug, Inc.</u>, 69 N.Y.2d 329, 333 (1987) (internal quotations omitted); <u>see also</u> <u>Murphy v. Am. Home Prods. Corp.</u>, 58 N.Y.2d 293, 302 (1983) ("[W]e conclude that recognition in New York State of tort liability for what has become known as abusive or wrongful discharge should await legislative action."); <u>Dalton v. Union Bank of Switz.</u>, 520 N.Y.S.2d 764, 765 (1st Dep't 1987) ("Plaintiff's employment was not for a specified period of time and, therefore, the hiring is presumed to be an employment at will.")  In this case, plaintiff provides no evidence of any written contract or agreement of a fixed duration, and is thus presumed to be an at-will employee.

Even though "New York does not recognize the tort of wrongful discharge," <u>Lobosco v. N.Y. Tel. Co./NYNEX</u>, 96 N.Y.2d 312, 316 (2001), New York carves out some exceptions to the

at-will doctrine in a few narrow circumstances. If assurances of job security are made by the employer, coupled with express provisions in an employee manual limiting an employer's ability to terminate at will, and the employee relies on these assurances, a contract may be implied. See Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 465-66 (1982). In Weiner, an employee terminated from his job was permitted to proceed with a breach of contract claim where he was orally assured that he would be terminated only for cause, he signed an employment application stating as much, the employee handbook contained an express provision stating that no employee would be discharged without just cause, and the employee turned down offers of employment in reliance on this assurance. Id.[4] The New York Court of Appeals has declined to expand the at-will employment exceptions much beyond Weiner,[5] and thus plaintiffs must plead facts similar to those in Weiner in order to proceed with their claims. See, e.g., Sabetay, 69 N.Y.2d at 329-335 (expressly rejecting the concept of implied covenant of good faith in implied employment contracts). "Not surprisingly, because of the explicit and difficult pleading burden, post-Weiner

_____

[4] Moreover, Weiner was also told by supervisors to be careful when discharging other employees that they were being discharged only for cause, in accordance with the employee handbook. Id.

[5] The Court of Appeals did permit a law firm associate to proceed on a retaliatory discharge and breach of implied contract claim, after being terminated for reporting alleged professional misconduct by another associate, because a lawyer's duties to his clients were at "the very core and . . . the only purpose of [plaintiff's] association with [the law firm]," such that the employee and employer duties were so "closely linked as to be incapable of separation." Wieder v. Skala, 80 N.Y.2d 628, 635 (1992). Even this case seems limited to its facts, as the Court of Appeals has refused to extend Wieder to other claims based on duties dictated by other professional codes or statute. See, e.g., Horn v. New York Times, 100 N.Y.2d 85, 97 (2003) (finding that a physician's professional obligation to follow the Code of Medical Ethics did not impose an obligation on her employer to terminate her only for just cause); Smith v. AVSC Int'l, Inc., 148 F. Supp. 2d 302, 315 (S.D.N.Y. 2001) (holding that violation of accountant's duties mandated by statute did not create a cause of action based on breach of implied contract for employee).

plaintiffs alleging wrongful discharge have not fared well." Id. at 334-35 (1987).

Slue's employment with NYU Health Center is a far cry from Weiner. Here, no oral assurances that Slue would be terminated only for just cause were made, and there is no evidence presented of detrimental reliance, such as turning down other jobs. More importantly, the handbook language upon which plaintiff relies does not suggest a limitation on at-will employment. Unlike Weiner, plaintiff provides no evidence that either the Health Center Manual or Staff Handbook contained any express statement that employees would only be terminated for cause. The Staff Handbook provides for "various circumstances that give rise to concluding employment at the [Health] Center," listing resignation, retirement, layoff, and discharge. (Citak Aff. Ex. W at 39.) While the Staff Handbook does not explicitly state that the Health Center is an at-will employer, it lacks any language assuring employees that they would be terminated only for cause. (See id.)

Moreover, in listing various types of job terminations, the Manual lists release, "defined as an involuntary separation from employment for reasons of a non-disciplinary nature" (Citak Aff. Ex. Y at 10-1c), and discharge, "defined as an involuntary separation from employment for cause." Thus, far from stating that plaintiff's employment cannot be terminated without a finding of misconduct, or without just cause, the Manual expressly provides for "involuntary separation from employment" without disciplinary cause.

The Manual also provides certain disciplinary procedures. For example, "[w]hen an employee has violated expected norms of behavior or the [Health] Center's policies, procedures or rules of conduct, the supervisor should thoroughly review the matter and assemble the pertinent data, including meeting with the employee." (Id. at 6-19d.) This language, however,

states only that defendants "should" follow certain procedures. Such hortatory language serves only as a guideline for supervisors, not as a mandate, and still less as a promise to employees that they may only be disciplined or fired if these particular procedures are followed.

In any event, disclaimers included in employee manuals "prevent[] the creation of a contract and negate[] any protection from termination [that] plaintiff may have inferred." Lobosco, 96 N.Y.2d at 317. NYU Health Center has made exactly such disclaimers. The Manual specifically states: "The [Health] Center maintains certain policies and principles as guide posts in the administration of its personnel activities . . . . However, the policies and statements in this book *are not a contract of any kind*." (Cohen Aff. Ex. 33 at 2-1a; emphasis added.) Similarly, the Staff Handbook states that "[t]he information is intended to serve as an overview only and *is not a contract of any kind*. Current policies and procedures are summarized, which may be changed, modified or rescinded at any time, with or without prior notice." (Cohen Aff. Ex. 34 at 4; emphasis added.) Even as to the specific procedures cited by Slue, the Manual provides that in certain situations, "the serious nature of a single violation will warrant bypassing some or all of the steps." (Cohen Reply Aff. Ex. 2 at 6-19e.) Thus, even if the Manual constituted a contract, and even if that contract committed defendants to following the specific procedures set forth in the Manual, those procedures themselves expressly grant the employer discretion to bypass the usual formalities where warranted. Given the plain disclaimers in the Manual and the Staff Handbook, and the exception for bypassing the procedures in sufficiently serious situations, NYU Health Center was free to terminate Slue at will, and Slue's wrongful discharge claim in his capacity as an NYU Health Center employee is dismissed as a matter of law.

Slue's claim of wrongful discharge as an NYU Medical School faculty member requires separate analysis.[6]  As a prerequisite to invoking any protection in the Faculty Handbook, plaintiff must provide sufficient evidence that he was indeed a faculty member to whom that document would apply.  Slue offers evidence that he was an NYU Medical School faculty member.  For example, he provides letters confirming his faculty appointment, his name was listed on NYU Medical School website's faculty list as late as February 1, 2004, and his identification badge listed both NYU Medical School and NYU Health Center.  (Citak Aff. Exs. M, N, O.)  Orlin acknowledged in her deposition that a note on Slue's confidential personnel profile indicated that his salary was paid in part by the Health Center, and in part by the Medical School.  (Orlin Dep. 23.)  Moreover, Freedberg acknowledged his status as a faculty member.  (See Citak Aff. Ex. P (referring to Slue as a faculty member).)  Given all of these indicators, a reasonable factfinder could easily find that plaintiff was indeed a faculty member.

The Faculty Handbook, however, contains no provision stating that faculty members, other than tenured faculty, can be terminated only for cause.  The Faculty Handbook explicitly assures that tenured faculty may be terminated only for cause:

> When a member of the teaching staff has permanent or continuous service or is serving an appointment for a term of years which has not expired, his or her services may be terminated by the University only for adequate cause, except in the case of retirement, or under extraordinary circumstances because of financial exigencies, or because of the discontinuance of a

---

[6] Levin states that Slue's employment with NYU Medical School is contingent upon his employment with NYU Health Center, and he analogizes Slue's employment situation to that of a resident physician.  (Levin Dep. 69-71.)  While Slue's two jobs may well have been linked, the only evidence on this issue is Levin's deposition, which a factfinder would not be required to credit.  At any rate, the Court need not decide this issue as the claim is dismissed on other grounds.

considerable part of the University . . . .

(Citak Aff. Ex. R at 30.)  Slue does not claim that he was a tenured faculty member, so these provisions do not apply to him.

No similar assurance or commitment is extended to non-tenured or part-time faculty such as Slue.  In the absence of such a provision, Slue argues that as a faculty member, he was entitled to the disciplinary procedures outlined in the Faculty Handbook, which he claims create an express limitation on NYU Medical School's ability to terminate him freely.  The Faculty Handbook contains a section describing the "General Disciplinary Regulations Applicable to Both Tenured and Non-Tenured Faculty Members" ("Disciplinary Regulations").  The Disciplinary Regulations, however, do not purport to limit the Medical School's authority to terminate a non-tenured faculty member at will.  The only *substantive* obligation that the Disciplinary Regulations impose is directed not to the Medical School, but to the faculty, who are advised of their obligation "to comply with the rules and regulations of the University," and to "live up to the standards of academic freedom as outlined in this statement."  (Citak Aff. Ex. R at 43.)  The Disciplinary Regulations further provide that:

> Disciplinary action may . . . follow when the faculty member engages in other conduct unbecoming a member of the faculty, such as violation of the [NYU] Rules for the Maintenance of the Public Order, any action which interferes with the regular operations of the University or the rights of others, any serious violation of the law, or any other conduct prejudicial to the teaching, research, or welfare of the University.

(Id.)

The Faculty Handbook then goes on to provide for certain disciplinary procedures, which are "applicable where a question arises concerning an alleged violation by any member of the

faculty of a rule or regulation of the University." (Id. at 43.) These procedures include a complaint process, encouragement to resolve matters informally "under the direction of the dean of the member's school at the departmental level or with a committee of the faculty of the school," and a hearing procedure. (Id. at 44.) While the procedures are declared "applicable" in cases of alleged violations of University rules, nothing in the procedures promises non-tenured faculty that they may not be dismissed for other reasons unless these specific procedures are followed.

In some cases, "when the employer has promulgated policies in a personnel manual specifying procedures or grounds for termination," the employee's status as at-will may be limited by the procedures. Mycak v. Honeywell, Inc., 953 F.2d 798, 801 (2d Cir. 1992) However, "[r]outinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements." Lobosco, 96 N.Y.2d at 316. (internal citations omitted). Id. at 802. The procedures here do not create a binding employment agreement for plaintiff. New York employees have brought viable claims when an employee manual provides detailed and specific procedures "in mandatory and unqualified terms." Mycak, 953 F.2d at 802. Here, however, there is no explicit assurance that the procedures will absolutely apply to plaintiff as a non-tenured faculty member. Instead, "[t]he . . . procedure[s] [are] applicable" only when "a question arises concerning an alleged violation by any member of the faculty of a rule or regulation of the University." (Citak Aff. Ex. R at 43 ¶ A.) Slue was not terminated for violating a University rule or regulation, but for alleged inappropriate conduct in the course of his private photography practice, not in his capacity as an NYU Health Center or

NYU Medical School employee.[7]  (Levin Dep. 69; Orlin Dep. 57; P. Mem. 30.)

The substantive and procedural provisions applicable to terminating tenured faculty provide a striking contrast.  First, the Faculty Handbook assures that tenured faculty members that "his or her services may be terminated by the University only for adequate cause."  (Citak Aff. Ex. R at 30, Title I, ¶ VI.2.a.)  Then, in providing it states, "Proceedings for termination of service for cause *shall* be conducted in accordance with such rules as may . . . be adopted by the Board of Trustees," and that the "person charged *shall* be entitled to a hearing."  (Id. at 30, Title I, ¶ VI.2.b; emphasis added.)  As to tenured faculty, then, the Faculty Handbook emphatically defines a limitation on the employer's freedom to fire, as well as procedures applicable in every case of termination to assure that those limitations are respected.  As to non-tenured faculty, no such assurances are provided.  Rather, the general Disciplinary Regulations simply provide a procedure that is "applicable" when someone is charged with violating a University rule (except when such an alleged violation could trigger termination of a tenured faculty member, in which case the mandatory procedures referred to above must be applied, see id. at 44, Title IV, ¶¶ B.7 & B.8).  Thus, the Faculty Handbook lacks any mandatory and unqualified language promising plaintiff an entitlement to these disciplinary procedures before he can be dismissed.

None of the other factors present in Weiner alter this conclusion.  In Weiner, plaintiff turned down another job offer after the plaintiff's employer had assured him that his employment was secure and that he would only be terminated for cause.  57 N.Y.2d at 460; see also Marfia v.

---

[7] Throughout the pleadings, the parties vigorously debate the issue of whether Slue's conduct was inappropriate or improper.  The Court is not in a position to make this assessment, nor is it necessary for the Court's determination.  The question before the Court is whether NYU Medical School was permitted to fire Slue based on its perception that his conduct was inappropriate, or indeed, for any non-discriminatory reason at all.

T.C. Ziraat Bankasi, 147 F.3d 83, 89 (2d Cir. 1998) (finding that plaintiff had detrimentally relied on the employee manual policies, where the manual was referred to as the "bible" and plaintiff turned down another job offer). Slue does not argue that he detrimentally relied on anything in the Manual, Staff Handbook, or Faculty Handbook. Nor can Slue point to the sort of express assurances that were made in Weiner. Slue provides no specific evidence or testimony that he was told that he could rely on the procedural protections of the Faculty Handbook. In his affidavit, he conclusorily states that he was told on "numerous occasions, both orally and in writing, that, as a member of [the NYU Medical School] faculty," he was entitled to all of the rights provided by the Faculty Handbook (Slue Aff. ¶ 3), but gives no details as to who made these assurances or in what context. Slue does provide a letter by Freedberg dated November 1, 2000, stating in relevant part, "I have spoken with the office of legal affairs and as an employee as well as a faculty member of New York University School of Medicine, you are entitled to the legal defense and indemnification as described in the NYU faculty handbook." (Citak Aff. Ex. P.) Contrary to plaintiff's assertion that the letter advised him that he was entitled to all rights accorded under the faculty handbook (see P. Mem. 20), the letter only refers to the indemnification protections for the NYU Medical School employees. Consequently, any reliance on the Medical School Faculty Handbook is unfounded and does not create an implied contract. Defendants' motion for summary judgment is granted as to Count One.[8]

_____

[8] Even if plaintiff's implied breach of contract claim for his employment at NYU Medical School were viable, damages would be limited. First, if Slue were successful in demonstrating that he was entitled to certain disciplinary procedures, he would then need to show that he would not have been terminated but for the failure to follow the procedures. Second, Slue testified that he received no increased compensation due to his appointment at the Medical School, as distinct from his employment by the Health Center. (Slue Dep. 30.) Third, the evidence indicates that Slue's appointment was not subject to automatic renewal, and thus any damages would be

B.     Improper Denial/Termination of Benefits

In Count Four, Slue alleges that defendants improperly terminated his health insurance benefits and improperly denied his pension benefits due to him. (Compl. ¶ 95.) Plaintiff fails to address this claim in his opposition brief to defendants' motion for summary judgment, and the claim has therefore been abandoned.

In any event, the claim is without merit. Plaintiff contends that NYU Heath Center and NYU Medical School terminated his and his family's health insurance coverage upon his termination on January 30, 2004, without notice and without the opportunity to obtain replacement coverage, and claims that his heath insurance was terminated deliberately, intentionally, willfully, and maliciously, and "in direct violation of the law." (Id. at ¶ 103.) Defendants point out that the Health Center Manual specifically provides that, "Upon resignation, layoff, release or discharge, an employee's coverage under the NYU [Health Center] Point-of-Service Medical Plan or HMO, drug, dental and life insurance plans will terminate as of the last day worked." (Citak Aff. Ex. 33 at 10-3.) As plaintiff's benefits were conditioned upon his employment with the Health Center, plaintiff's claim for improper termination of benefits fails.

As to his pension benefits, Slue alleges that defendants "caused . . . [plaintiff] to be deprived of his pension and the monies in his pension account to which he is presently due." (Compl. ¶ 105), and that defendants refused to communicate with plaintiff regarding his pension benefits. (Id. at ¶ 104.) Defendants offer undisputed evidence, including Slue's own testimony, that defendants have communicated with plaintiff regarding his benefits, and that he is collecting

constrained to the remaining time on his yearly appointment. (See Citak Aff. Ex. Q.)

his pension benefits.  (Slue Dep. 148.)  Therefore the claim is moot, and defendants' motion for summary judgment as to Count Four, Slue's improper denial/termination of benefits claim, is granted.

III.    Property Claims

    A.    Improper Termination of Lease

In Count Three, plaintiff alleges that he entered into a lease with NYU Health Center in October 2002 for space to conduct his private dermatology photographic practice, Williams Slue Services, Inc. (Compl. ¶ 30, 85.)  He claims that the Health Center improperly terminated this lease in January 2004, resulting in his having to cancel TBP appointments with 40 private patients.  (Id. at 87; Citak Aff. Ex. HH; P. Mem. 23.)  Plaintiff's claim fails.

It is undisputed that Slue never signed a written lease with the Health Center.  (Slue Dep. 98.)  Instead, Slue claims that his agreement with Orlin and Freedberg constituted an oral lease. (P. Mem. 22.)  A landlord-tenant relationship may be created orally, and such oral leases may be enforceable.  Restatement (Second) of Property:  Landlord & Tenant § 2.1 (1977).  Nevertheless, certain essential factors must be present in the agreement to establish an oral lease under New York law, including the "area to be leased, the duration of the lease, and the price to be paid." Davis v. Dinkins, 613 N.Y.S.2d 933, 935 (2d Dep't 1994).

Here, plaintiff and defendant NYU Health Center agreed upon the area where Slue would conduct his private practice, namely the office space in and around Room H124, and agreed that Slue would use the space only a few times per month on evenings and weekends, for the express purpose of conducting TBP sessions referred to him by various dermatologists.  (Id. at ¶¶ 32-34.) The parties also agreed that Slue would pay the Health Center $400 per month for his use of this

space, and Slue paid this amount to the Health Center's Department of Dermatology from October 2002 to December 2003.  (Compl. ¶ 37.)  Nevertheless, plaintiff's claim ultimately fails because he neglects to show that the parties established a duration for the agreement.  Lacking this essential factor, the arrangement between the parties did not create a lease.  Therefore, defendants' motion for summary judgment on Count Three, plaintiff's improper termination of lease claim, is granted.

### B.  Conversion of Personal Property

Plaintiff alleges in Count Two that his personal property, including cameras, lighting equipment, a dermoscopy unit, power packs, flash heads, and a laptop computer, was wrongfully appropriated and retained by defendants.  (Compl. ¶ 76.)  Specifically, he claims that on January 26, 2004, when plaintiff was terminated from his employment with NYU Health Center and NYU Medical School, he was locked out of his office (id. at ¶ 75), and the Health Center "physically prevented" him from gathering any of his personal property besides his briefcase.  (Slue Aff. ¶ 30.)  Plaintiff contends that all of the property in question was for the specific use in his private TBP practice, and argues that by denying him access to this property, defendants are liable for conversion.  Plaintiff presents a viable claim.

Under New York law, a claim of conversion exists when the plaintiff shows "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property."  Atlanta Shipping Corp., Inc. v. Chemical Bank, 818 F.2d 240, 249 (2d Cir. 1987), quoting Meese v. Miller, 436 N.Y.S.2d 496, 500 (4th Dep't 1981).  Conversion can occur "when the defendant refuses to return the property after a demand or sooner disposes of the property."

White v. City of Mt. Vernon, 633 N.Y.S.2d 369, 370 (2d Dep't 1995.)  The New York courts have upheld claims by employees whose employers have taken their personal property.  See, e.g., Schulman v. Continental Ins., 685 N.Y.S.2d 794, 796 (2d Dep't 1999) (finding a viable cause of action in conversion against certain defendants who allegedly did not return personal property upon termination); Daniel v. Long Island Univ., 585 N.Y.S.2d 349, 353 (1st Dep't 1992) (finding a viable conversion claim).

Slue has since resumed dominion and control over most of the converted goods, except, he claims, his passport camera and slides.  Returning property to the rightful owner, however, does not absolve defendants of all liability from the alleged conversion.  A claim for conversion will exist even when the deprivation is partial or temporary.  Pierpont v. Farnum, 254 N.Y.S. 758, 763 (2d Dep't 1931).  For the property returned to plaintiff, defendants will be liable for the damages, if any, resulting at the time of the conversion.  See Silverstein v. Marine Midland Trust Co. of N.Y., 152 N.Y.S.2d 30, 32 (2d Dep't 1956) (noting that the "sole measure of damages . . . is the loss flowing from the wrongful withholding of possession"); see also Toshoku Am., Inc. v. Rhoda Lee, Inc., 622 N.Y.S.2d 943, 944 (1st Dep't 1995) (finding that damages were appropriate in a conversion claim for the time that the goods at issues were withheld).

A reasonable factfinder could conclude, based on the evidence in the present record, that plaintiff did suffer damages as a result of the alleged conversion.  First, Slue testifies that when NYU Health Center denied him access to his laptop computers, he was prevented from using the photographs of his patients from his private practice and his notes and photographs that he needed for a lecture at a conference in Washington, D.C., the following week.  (Slue Aff. ¶ 30.) In his affidavit, Slue also states that his laptop was functioning when he left it, but was not

functioning when it was returned to him. As a result, he had no choice but to buy a new one immediately, at a cost of $3,000. (Id. at ¶ 36.) Defendants counter that not one but two laptops were found in Slue's office, and one of the laptops was already malfunctioning when Decision Strategies attempted to inspect it (Citak Aff. Ex. 25 at 31-32), but this contention at most presents an issue of fact to be resolved by a jury.

Defendants argue that they were authorized to seize Slue's property under the guidelines of the Staff Handbook. (D. Mem. 16.) Defendants rely in particular on a provision which reads: "All lockers, desks, personal computers and offices remain the property of NYU [Health] Center. Accordingly, the [Health] Center may inspect a locker, desk, personal computer, or office at any time, with or without cause." (Citak Aff. Ex. 34 at 17.) Defendants argue that this provision allowed them to search plaintiff's belongings, including his personal computer. Defendants infer that the term "personal computer" may be interpreted to include computers personally owned by NYU Health Center employees. (D. Mem. 16.) In common parlance, however, the term "personal computer" – or "P.C." – is most typically used to describe any small-sized "general-purpose computer equipped with a microprocessor . . . for an individual user," as opposed to a large "main frame" computer. Merriam-Webster Online Dictionary, http://www.m-w.com/dictionary/personal%20computer (last visited Dec. 23, 2005). The Handbook's language is thus at the very least ambiguous, and a factfinder could easily find that the language means that NYU reserves the right to inspect "personal computers" that it owns and assigns for the use by employees, rather than asserting the right to inspect computers that are the personal property of its employees that happen to be brought by the employee onto NYU's property.

Moreover, because the handbook specifies items that "*remain the property* of NYU [Health] Center," the Staff Handbook suggests that the items over which NYU Health Center may assert its inspection rights include only items that always have been NYU Health Center property. In fact, the New York University Rules for the Maintenance of Public Order prohibit "[u]nauthorized access to or use of personal property, including files and records." (Citak Aff. Ex. R. at 124.) The Staff Handbook therefore does not conclusively permit defendants to inspect Slue's private property.[9] Because plaintiff has provided sufficient evidence where a reasonable jury could find a claim for conversion, defendants' motion for summary judgment as to Count Two is denied.

IV.    Defamation Claims

     A.     Slander

In Count Five, Slue alleges that various defendants slandered him on several occasions. Specifically, he alleges that: (1) Freedberg defamed him in a February 2004 telephone call with Dr. Ralph Myrow, an NYU School of Medicine Clinical Professor of Dermatology; (2) Freedberg defamed him in a March 2004 conversation with Dr. Herbert Fine, also an NYU School of Medicine Clinical Professor of Dermatology; (3) Orlin defamed him in a February 2005 conversation with Dr. Shupak, an NYU Medical School Professor of Dermatology; and (4) Freedberg, Orlin, Odom, Harney, and Decision Strategies all made slanderous statements to "many other persons." Plaintiff's slander claim will be dismissed.

---

[9] In any event, any right to "inspect" a computer would not entail a right to detain it for an extended period of time. Thus, even if the Health Center had the right to inspect Slue's computer, an issue of fact would remain as to whether defendants' detention of the property exceeded the scope of that right, and as to whether, as Slue maintains, their actions resulted in its destruction.

To establish a cause of action for slander in New York, the following seven elements must be established: "(I) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." Loksen, 239 F.3d at 265-66. Defendants do not contest the third, fourth, or sixth elements, namely that the statements by both Freedberg and Orlin were published to a third party, the statements were "of and concerning" Slue, and that the statements constituted slander per se, and they acknowledge that the second and fifth elements (falsity and fault) present issues of fact. Defendants argue, however, that they are entitled to summary judgment because plaintiff has not presented sufficient evidence to establish a genuine issue of fact as to the first and seventh elements, contending that the statements as a matter of law are not defamatory, and are in any event privileged.

First, to constitute slander, the statement must be a defamatory statement of fact, and the statement must be "reasonably susceptible to the defamatory meaning imputed to it." Levin v. McPhee, 119 F.3d 189, 195 (2d Cir. 1997). Plaintiff alleges that a conversation between Freedberg and Myrow was defamatory, in that "Freedberg stated . . . that there had been a long history of improper conduct by [p]laintiff," and that Myrow would be "leaving [him]self open for complaints" if he continued to refer patients to plaintiff. Myrow believed that the "tone and context of the words used by . . . Freedberg" created a clear impression that the conduct involved "taking pornographic images." (Myrow Aff. ¶ 3, 8; P. Mem. 8.) In a conversation with Fine, Freedberg told Fine that photos taken by plaintiff were so "incriminating," "terrible" and "unjustified" that "left no choice but to terminate plaintiff." Fine testified that "the clear

message . . . was that those photographs were pornographic in nature." (Fine Aff. ¶¶ 8-9.) Similarly, Shupak states that Orlin "informed [Shupak] that plaintiff was fired for taking grossly inappropriate photographs of dermatology patients" and that "there was no justification in medical or dermatological photography to explain the photographs she had seen" (id. at ¶ 6), "clearly impl[ying] that [p]laintiff was terminated solely based on . . . conduct . . . which involved taking pornographic images."[10] (Shupak Aff. ¶ 8; see also id. at ¶ 10.)

Plaintiff does not claim that Freedberg or Orlin ever used the word "pornographic" in any of these conversations. Rather, both Freedberg and Orlin allegedly described Slue's actions as "grossly inappropriate conduct" or "grossly improper conduct," which the doctors who heard them understood to mean "pornographic." "If any defamatory connotation is possible, it is a question of fact for the jury whether the statements were understood as defamatory." Loksen, 239 F.3d at 267. In this case, as Slue was a medical photographer, it would be reasonable for a jury to conclude that statements accusing plaintiff of "grossly inappropriate conduct," even based on these words alone, could have a defamatory implication.

Second, defendants counter that even if the other elements of a slander claim are established, the alleged defamatory communications were all protected by a qualified privilege. (D. Mem. 20.) Statements made in furtherance of a compelling public interest are afforded an absolute privilege, whereas statements between parties with a common interest are afforded a qualified privilege. Meloff v. N.Y. Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001). "The

---

[10] Defendants argue that these statements are inadmissible hearsay. (D. Mem. 19.) However, the statements are not hearsay, because they are offered not "to prove the truth of the matter asserted," Fed. R. Evid. 801(c), but rather for the fact that they were made and conveyed a defamatory implication to the listeners. Myrow, Fine and Shupak offer admissible first-hand testimony of defendants' alleged defamatory statements.

rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded." Liberman v. Gelstein, 80 N.Y.2d 429, 437 (1992). The common interest privilege has been applied to communications among fellow employees. See Loughry v. Lincoln First Bank, 67 N.Y.2d 369, 376 (1986) (suggesting that statements among employees at a confidential meeting may very well be privileged); Stuckuls v. New York, 42 N.Y.2d 272, 280 (1977) (noting that a privilege would apply to communications between members of a faculty tenure committee); Dillon v. City of New York, 704 N.Y.S.2d 1, 7 (1st Dep't 1999) (noting that when "statements are made about an employee in an employment context, . . . they are qualifiedly privileged as having been made by one person to another upon a subject in which they have a common interest"). The privilege also attaches when the speaker believes he has a duty to make the communication, "though the duty be not a legal one, but only a moral or social duty of imperfect obligation." Shapiro v. Health Ins. Plan of Greater N.Y., 7 N.Y.2d 56, 60 (1959).

By virtue of their employment with NYU Medical School, Fine, Myrow, and Shupak had an interest in the details of Slue's discharge. All three were faculty members in the Dermatology Department at the Medical School, where Freedberg was the department chair. Notably, Shupak initiated the conversation with Orlin, requesting an appointment with her for the express purpose of discussing Slue's termination. (Shupak Aff. ¶ 6.)[11] Therefore, the communications were protected by a common interest privilege.

---

[11] All three physicians also referred patients to Slue, but it is unclear from the record presented whether this was connected with any employment with NYU Health Center or in their private practices.

A plaintiff may rebut this common interest privilege by showing that the defendant acted outside the scope of the privilege, that the defendant acted with malice, or that the defendant acted with reckless disregard for the truth or falsity of the statement.  Loughry, 67 N.Y.2d at 376.  To reach the jury on recklessness, a plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication."  Harte-Hanks Commc'ns. v. Connaughton, 491 U.S. 657, 687 (1989) (internal citations omitted).  Plaintiff has speculated as to Freedberg and Orlin's motives for having these conversations, but mere "conclusory assertions will not defeat summary judgment."  Freedman v. Chemical Constr. Corp., 43 N.Y.2d 260, 264 (1977).  Whether or not defendants' conclusions were correct, Slue offers no evidence whatsoever suggesting that defendants did not in good faith believe that his conduct was inappropriate, that they so much as entertained a doubt on that score, or that they acted from any impermissible motive.  Thus, plaintiff's evidence is insufficient to overcome Freedberg and Orlin's common interest privilege protecting their communications with Fine, Myrow, and Odom.[12]

Since Freedberg and Orlin's allegedly defamatory statements to Fine, Myrow, and Shupak were protected by a common interest privilege, and Slue has not presented evidence of any statements made by defendants to any other persons, defendants' motion for summary judgment on Count Five is therefore granted.

---

[12] Plaintiff's additional claim that the respective defendants' defamatory statements were also made to "other persons" must be rejected.  Plaintiff has offered no evidence that any defamatory statements were made to any "other persons," nor has he identified who these individuals might be.  Mere speculation is insufficient to support a claim, and thus, plaintiff fails to state a claim for slander as to alleged statements to unspecified "other persons."

B.  Libel

Plaintiff alleges in Count Six that Freedberg made several libelous statements in three separate e-mails to more than 120 people on January 26, 2004 ("January 26 e-mail"), February 5, 2004 ("February 5 e-mail"), and February 20, 2004 ("February 20 e-mail"). (Compl. ¶¶ 129, 131, 134.) Slue alleges that these e-mails were intended to convey that Slue dealt in pornography, used pornographic photographic techniques, and took photographic images of patients that were pornographic. (Id. at ¶ 141.) To satisfy a prima facie case of libel, a plaintiff must show five elements: (1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by defendant; (3) the fault of the defendant; (4) that the statement was false; and (5) that the plaintiff was injured as a result of the statement. Meloff, 240 F.3d at 145. The second element, that the e-mails were published to a third party, and the third element, that defendant wrote the e-mail, are not contested. Additionally, because the statements involve plaintiff's trade or profession, he need not demonstrate injury for his libel claim to go forward. See Wadsworth v. Beaudet, 701 N.Y.S.2d 145, 147-48 (3d Dep't 1999) (stating that defamation claims that tend to injure one's trade, business or profession need not establish special damages). Defendants argue that the statements are true and protected by qualified privilege. Defendants' arguments are unconvincing and plaintiff's claim survives for at least some of the e-mails at issue.

Freedberg's January 26 e-mail stated as follows:

On January 26th we were informed of the possibility of serious problems in our Photography Unit. As I am sure you understand, I can not discuss the details of these matters because of concerns for the privacy of all who may be involved. We are working with the Institution to resolve these issues as quickly as possible. Even in the face of these difficulties, the Photography Unit is providing

26

service as usual.

(Citak Aff. Ex. BB.)  Standing on its own, Freedberg's January 26 e-mail could not constitute

libel against Slue, as it does not even mention Slue or even implicitly refer to him.  Thus, it

would not meet the first requirement of a libel claim, namely, that the statement concerns the

plaintiff.  Therefore, plaintiff's claim of libel as to the January e-mail is dismissed.

Freedberg's February 5 e-mail to most of the same recipients[13] included his previous

message from the January e-mail and added:

> As a follow-up, I am writing now to advise you that Bill Slue's
> employment and association with NYU [Health] Center terminated
> on January 30, 2004.  In addition, Bill Slue is no longer on our list
> of recommended photographers.  This decision was made by the
> Institution after a detailed investigation and in light of clear
> evidence, which I have seen.

(Citak Aff. Ex. CC.)

Following this February 5 e-mail, Slue sent an e-mail to "essentially the same people" (P.

Mem. 6), in which he stated, among other things:

> I was summarily terminated . . . without notice, without a hearing
> and without an explanation as to why that action was taken, all of
> which is in clear violation of my rights as an employee and
> member of the faculty . . . . I believe that [representatives of NYU
> Health Center] have committed many egregious acts, violating not
> only my rights but also the privacy rights of patients.  I have
> retained legal counsel and intend to vigorously pursue all legal
> rights and remedies available to me, which most certainly will
> include seeking damages for the defamation of my good name and
> the assassination of my character.  I am outraged at the way I have
> been treated as I have done nothing unprofessional or improper.

---

[13] Freedberg states in his February 5 e-mail that he wrote his January 26 e-mail to "many
of you," suggesting that the address list for the two communications was not necessarily
identical.  (Cohen Aff. Ex. BB.)  The record contains only a list of e-mail addresses for the
February 5 e-mail.

(Citak Aff. Ex. CC.)  In reply, on February 20, Freedberg sent a third e-mail, stating, in relevant part:

> I can assure you . . . that [plaintiff] was terminated for cause and that he knows the extent of the evidence that was found . . . . In this case, with the evidence presented, the Institution had no choice but to take the action it did.  I am confident that if you had seen the evidence that I did, you would have come to the same conclusion I reached and would have completely supported the action the Institution took . . . . I must repeat what I have written previously – based on the evidence, we can not recommend that you send patients to Bill Slue for total body photography.

(Citak Aff. Ex. DD.)[14]

With both the February 5 and February 20 e-mails, defamatory connotations can be inferred.  Plaintiff provides affidavits of several individuals who felt that the e-mails suggested grossly inappropriate conduct.  (See Myrow Aff. ¶ 7-8; Shupak Aff. ¶¶ 9-10; Fine Aff. ¶¶ 5-6.)  If a defamatory construction is possible, the claim must go to the jury.  Loksen, 239 F.3d at 267.

Defendants argue that both February e-mails are true, and thus can not state a claim for libel.  Under New York law, "truth is an absolute, unqualified defense to a civil defamation action."  Commonwealth Motor Parts, Ltd. v. Bank of Nova Scotia, 355 N.Y.S.2d 138, 141 (1st Dep't 1974).  While defendants allege that Slue himself conceded that the statements are true, the deposition testimony clearly indicates that Slue disputes the truth of the allegedly defamatory portions of the e-mails.  (Slue Dep. 128-31.)

---

[14] Again, the record is not clear as to the recipients of this communication.  The copy of the e-mail in the record is actually of an e-mail that Freedberg sent to Slue on February 20, 2004, informing him that he had sent an e-mail "to the Department," and incorporating the text of that e-mail.  (Citak Aff. Ex. DD.)  The parties appear to assume that the e-mail went to essentially the same people as Slue's e-mail, and as Freedberg's January 26 and February 5 e-mails.

There is no dispute that the first sentence of the February 5 e-mail is true, *i.e.* that he was terminated on January 30, 2004. Slue contends, however, that the other statements are false, in that there was no such list of recommended photographers (Slue Dep. 130), no detailed investigation took place, and his photos did not demonstrate any wrongdoing. Viewed in the light most favorable to plaintiff, the evidence raises genuine issues of fact. Defendants offer no proof of such list of recommended photographers. While defendants clearly conducted an investigation, the quality of the investigation is disputed. But more importantly, whether "clear evidence" existed presents an issue of fact that is more appropriately decided by a jury. Taken as a whole, the February 5 and February 20 e-mails could be found by a reasonable jury to convey a clear imputation of serious wrongdoing by Slue. To say that a long-time employee has been fired, and removed from a putative list of "recommended photographers," on the basis of a "detailed investigation" and "clear evidence" that left the University "no choice" but to terminate "for cause" could be taken by a reasonable fact-finder as an assertion that the employee engaged in serious, albeit unspecified, misconduct. Thus, while the statements in the February e-mails that state that plaintiff was terminated are true and not actionable, statements that imply wrongdoing by plaintiff could be libelous.

Defendants also argue that the e-mails constitute Freedberg's opinion, and thus were not actionable statements of fact. In assessing whether a statement is one of fact or opinion, New York courts frequently use four factors as guidelines: (1) whether the specific language has precise meaning which is readily understood or indefinite and ambiguous; (2) whether the statement can be objectively characterized as true or false; (3) an examination of the full context of the communication; and (4) whether the broader social context signals whether the statement

29

is likely to be an opinion or fact.  Steinhilber v. Alphonse, 68 N.Y.2d 283, 292 (1986).  The e-mails contain statements that are definite and unambiguous, explaining that NYU had no choice but to terminate Slue due to uncontroverted evidence based on an objective standard, suggesting a statement of fact.  As to those portions that could be construed as Freedberg's opinion, the statements are at best ones of "mixed opinion," which are actionable if they "impl[y] that [they] are based upon facts which justify the opinion but are unknown to those reading or hearing it." Id. at 289.  Freedberg's e-mails do not merely imply, but expressly state, that they are based on facts known to him that provide evidence of certain conduct warranting termination.

Last, defendants argue that the e-mails are protected by qualified privilege.  Unlike the statements by Freedberg and Orlin to colleagues in the NYU Medical School Dermatology Department, however, defendants do not clearly indicate the role and status of the recipients of the communication.  Freedberg asserts that the e-mail list is "*predominantly* the list of the faculty of dermatology at NYU" but also stated that "I think it would be hard to be for sure."  (Freedberg Dep. 167; emphasis added.)  Similarly, he stated that although he didn't recognize any e-mail recipients who were not members of the NYU faculty, he could not be sure there were none, because "I don't know everybody's e-mail address."  (Id. at 168.)  While defendants provide a list of names and e-mail addresses and then a list of faculty members (see Citak Reply Aff. Ex. 6), the list of e-mail addresses is not attached to the actual allegedly libelous e-mail, nor is it clear that these are faculty members within NYU Medical School or in other NYU schools or departments.  Plaintiff, for his part, claims to have identified at least seven individuals on the e-mail list who appear to be affiliated with other universities.  (Slue Aff. ¶ 43.)  Because defendants, as movants, bear the burden of establishing the absence of any genuine issue of

material fact, <u>Anderson</u>, 477 U.S. at 256, the absence of any more specific indication of who the e-mail recipients are, and of whether they are employed by or even affiliated with NYU makes it impossible to find as a matter of law that defendants are entitled to a qualified privilege.[15] Therefore, defendants' motion for summary judgment for Count Six is denied with respect to the February 5 and February 20 e-mails.

V.      Intentional Tort Claims

      A.      Tortious Inflication of Emotional Distress

In Count Seven, plaintiff alleges that he suffered severe emotional distress as a result of his termination from NYU and defendants' alleged conversion and defamation.[16]  (Compl. ¶¶ 150-152.)  To establish a claim of tortious inflication of emotional distress, four elements must be shown: (1) extreme and outrageous conduct; (2) an intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. <u>Bender v. City of New York</u>, 78 F.3d 787, 790 (2d Cir. 1996).  New York courts, adopting the standard set forth in the Restatement of Torts, require a very high threshold to establish a claim of intentional inflication of emotional distress, such that a plaintiff must show that the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible

_____

[15] To the extent that Freedberg's February 20 e-mail responded to Slue's e-mail, and went to the same recipients, a common interest privilege might exist.  Defendants do not make this argument, however, and the factual premise is not clearly established on the present record. Accordingly, the Court does not pass on any such claim of privilege.

[16] Intentional inflication of emotional distress is a residual tort, and plaintiff must allege extreme conduct that is not already an independent tort.  Thus, any injury or emotional distress stemming from defendants' alleged defamation is already included in plaintiff's libel and slander claims.  <u>See</u> Restatement (Second) of Torts § 5 ch.24 (1977) (categorizing libel and slander as torts).

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Murphy, 58 N.Y.2d at 303, quoting Restatement (Second) of Torts § 46(1), cmt. d.

Claims of intentional infliction of emotional distress in the context of employment disputes or firings are rarely found to meet these standards. In Knudsen v. Quebecor Printing (U.S.A.), 792 F. Supp. 234 (S.D.N.Y. 2001), for example, the plaintiff alleged that he suffered severe emotional distress as a result of defendant's intentional, wilful, and malicious misrepresentation of his job performance, culminating in his termination. Id. at 241. The court found that plaintiff's allegations that he was "shocked, embarrassed, and humiliated" and that he suffered "nervous and erratic behavior, weight loss, lack of sleep, puffiness and swelling" failed to constitute severe emotional distress. Id. Even more telling, in the New York Court of Appeals, every claim of severe emotional distress "has failed because the alleged conduct was not sufficiently outrageous." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 122 (1993). Other courts in New York have similarly rejected recently-terminated employees' claims of severe emotional distress because they failed to meet the stringent burden required under New York law.[17]

Like the unsuccessful plaintiffs in these cases, Slue merely alleges in a very general manner that he has "sustained great pain, suffering, mental and emotional anguish, depression

---

[17] See, e.g., Singh v. U.S. Security Assoc., No. 03 Civ. 2059 (FM), 2005 WL 236511, at *14 (S.D.N.Y Feb. 1, 2005) (holding that a plaintiff's "garden-variety dispute" with his former employer may have had a "crushing impact on him and his family" but was insufficient to sustain a severe emotional distress claim); Lawford v. N.Y. Life Ins. Co., 739 F. Supp. 906, 919 (S.D.N.Y. 1990) (finding that plaintiff's claims that his former employer's failure to pay his pension benefits led to his severe emotional distress did not meet the strict New York standard for such a claim); Kirwin v. N.Y. State Office of Mental Health, 665 F. Supp. 1034, 1040 (E.D.N.Y. 1987) (holding that plaintiff's allegations of isolation, ostracization, and harassment campaign by the defendant merely amounted to "insults, indignities, annoyances and petty oppressions" which did not meet the strict burden required under New York law for severe emotional distress).

and anxiety, and he has been held up to scorn, ridicule and contempt by friends, acquaintances, business associates and the general public."  (Compl. ¶ 152.)  While being fired and accused of wrongdoing would certainly be highly distressing to anyone, Slue offers no evidence of extreme pain.  Slue admits that he has not seen a health care professional for his emotional anguish, contending that he has handled his distress in his "own spiritual way."  (Slue Dep. 158.)  He offers no concrete evidence regarding physical or behavioral symptoms of such distress.  Slue's vague assertions are insufficient to amount to severe emotional distress.

Moreover, intentional infliction of emotional distress is a tort of malevolence, and thus requires the plaintiff to prove "that the defendant acted out of a desire to hurt the plaintiff rather than promote the defendant's legitimate interests."  Montalvo v. Fed. Express Corp., No. 94 Civ. 7858 (LLS), 1995 WL 733600, at **3 (S.D.N.Y. Dec. 11, 1995).  In this case, there is no evidence of malice by Freedberg toward plaintiff.  Even if Freedberg was hasty or wrong, or acted in bad faith by proceeding based on his fear of liability without a genuine belief that misconduct existed, that would still be insufficient to fulfill the intent requirement for intentional infliction of emotional distress.  Accordingly, defendant's motion for summary judgment on Count Seven is granted.

B.    Interference with Contract

Plaintiff's claim for tortious interference of contract in Count Eight similarly fails.  The elements of a tortious interference claim are:  (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; and (3) an actual breach of the contract and damages resulting from such breach.  Bradbury v. Cope-

Schwarz, 798 N.Y.S.2d 207, 209 (3d Dep't 2005). A viable tortious interference claim requires that plaintiff and a third party have a contract, and that defendants improperly caused the third party to breach. However, this is not what plaintiff alleges here. Instead, plaintiff alleges that "Freedberg and Orlin knew of the contractual arrangement that [p]laintiff . . . had with [d]efendants NYU [Health] Center and NYU Medical School to lease certain office space." (Compl. ¶ 156.) First, as discussed above in Part III.A, no lease or contract existed for the office space. Second, Freedberg and Orlin are both employees of NYU Medical School and NYU Health Center, respectively, and thus do not constitute third parties. Therefore, plaintiff's claim for interference with contract, Count Eight, is dismissed.

     C.     Interference with Economic Opportunity

In Count Nine, plaintiff alleges that each of the defendants, both individually and collectively, "sought to eliminate [his] private practice." (Compl. ¶ 164.) He contends that by sending Iris Cortez into his private dermatology photography practice under false pretenses, defendants acted to entrap him and to use the incident with her as a basis for his termination from NYU Health Center and NYU Medical School. (Id. at ¶¶ 165, 168.) Additionally, plaintiff alleges that defendants have sought to deter Slue's former patients, new patients seeking TBP, and numerous health care providers from utilizing his services as a dermatological photographer. (Id. at ¶¶ 171-175.) Plaintiff's arguments are unavailing.

To prove a claim of tortious interference with economic opportunity, a plaintiff must show either that the defendant's interference "was accomplished by 'wrongful means' or that defendant acted for the sole purpose of harming the plaintiff." Snyder v. Sony Music Entm't, Inc., 684 N.Y.S.2d 235, 239 (1st Dep't 1999). Plaintiff expresses his belief that Freedberg and

Orlin planned to take over his business (Slue Aff. ¶ 19), but offers no evidence of any such motivation.  Freedberg, on the other hand, stated that he felt a responsibility to inform other physicians and health care providers of potential liability if they continued to refer patients to Slue, and that prior to Slue's termination, he "wasn't out to get [Slue]" but was "looking for an excuse to not have to destroy . . . Slue," as he had "fought for . . . Slue for 20 years." (Freedberg Dep. 169, 187, 227.)  Because plaintiff has offered only speculation in support of his claim, defendants' motion for summary judgment on Count Nine is granted on Count Nine.

VI.     Violation of Privacy Laws

        Lastly, plaintiff alleges in Count Ten that defendants examined, reviewed, or copied various diagnostic medical records of Slue's private patients which had been in his possession, custody, and control, in violation of state and federal privacy laws.  (Compl. ¶ 181, 184.) Plaintiff contends that these violations may subject him to liability for damages from these private patients whose records have been inspected.  (Id. at ¶ 187.)  Plaintiff specifically claims that defendants' actions were in violation of the Health Insurance Portability and Accountability Act ("HIPAA").  (P. Mem. 29.)  Federal courts have found that Congress did not intend for HIPAA to create a private cause of action for individuals.  See Runkle v. Gonzales, 391 F. Supp. 2d 210, 237 (D.D.C. 2005) (collecting cases).  To the extent that anyone's privacy rights were violated, those rights belonged to the patients, not to Slue, and Slue accordingly lacks standing to make a claim.  Therefore, plaintiff does not have a cause of action against defendants for a HIPAA violation, or for breach of any comparable state law, and defendants' motion for summary judgment on Count Ten will be granted.

VII.    Breach of Fiduciary Duty Counterclaim

Plaintiff cross-moves for summary judgment as to the defendants' breach of fiduciary duty counterclaim.  Defendants allege that in Slue's affiliations with NYU Health Center and NYU Medical School, he owed to them the fiduciary duties of good faith, fair dealing, and undivided loyalty.  (Answer ¶ 212.)  To establish a cause of action for a breach of a fiduciary duty, the plaintiff must show that (1) the parties had a fiduciary relationship and (2) the fiduciary duty has been breached.  Cramer v. Devon Group, Inc., 774 F. Supp. 176, 184 (S.D.N.Y. 1991).  In New York law, "[i]t is well settled that an employee owes a duty of good faith and loyalty to an employer *in the performance of the employee's duties*."  Wallack Freight Lines, Inc. v. Next Day Express, Inc., 711 N.Y.S.2d 891, 891 (2d Dep't 2000) (emphasis added).

The conduct defendants assert amounted to plaintiff's breach of a fiduciary duty is his inappropriate conduct in connection with his private practice, the same conduct for which he was terminated.  (D. Reply 18-19.)  While plaintiff denies engaging in such conduct, he notes that the alleged conduct fell outside the scope of his duties to NYU Health Center or NYU Medical School, since it took place in his private practice.  (P. Mem. 30.)  Importantly, defendants do not suggest that plaintiff's private practice interfered with their own business practices, as is the case in most situations when courts have found a breach of a fiduciary duty.  See, e.g., Duane Jones Co., Inc. v. Burke, 306 N.Y. 172, 188-89 (1954) (finding a breach of fiduciary duty when defendant employees "determined upon a course of conduct which . . . resulted in benefit to themselves through destruction of [the plaintiff corporation's] business").  Even if Slue's conduct was improper, that conduct does not breach Slue's loyalty towards NYU Health Center or NYU Medical School or betray his agency as an NYU employee, as defendants allege.

36

Absent a connection to the defendants, improper conduct alone is not sufficient to sustain a breach of fiduciary duty. Thus, defendants have failed to present sufficient evidence to establish a breach of fiduciary duty, and plaintiff's motion for summary judgment on defendants' first counterclaim is therefore granted.

VIII.    The Motion to Strike

Defendants' motion to strike is just another tactic in the parties' acrimonious relationship. Defendants move to strike plaintiff's cross-motion for summary judgment as untimely, to strike portions of the Slue's Affidavit that are "not based on personal knowledge, contradict his prior deposition testimony and contain impermissible legal conclusions," and to strike other portions of additional affidavits submitted by the plaintiff for their failure to comply with Fed. R. Civ. Pro. Rule 56(e). (D. Mem. Motion to Strike 1.)

"Motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." Zinaman v. USTS N.Y. Inc., 798 F. Supp. 128, 135 (S.D.N.Y. 1992). While plaintiff's cross-motion was untimely, defendants have had, and have availed themselves of, adequate opportunity to respond. As defendants were not prejudiced, and as plaintiff's motion has merit, the interests of justice requires denial of defendants' motion to strike plaintiff's motion addressed to defendants' counterclaim. Because the Court has dismissed all of plaintiff's causes of action that relate to the provisions of Slue's affidavit that defendants seek to strike, defendants' motion is moot as to them. Finally, defendants establish no prejudice from any technical violations of the Federal Rules with respect to the other affidavits submitted by plaintiff. Therefore, defendants' motion to strike is denied.

## CONCLUSION

Defendants' motion for summary judgment is granted as to Counts One, Three, Four, Five, Seven, Eight, Nine, and Ten, and denied as to Counts Two and Six. Plaintiff's cross-motion for summary judgment on defendant's first counterclaim is granted. Defendants' motion to strike is denied.

SO ORDERED.

Dated: New York, New York
      January 3, 2005

GERARD E. LYNCH
United States District Judge